Good morning, Your Honors. May it please the Court, my name is Thomas K. Gilhool. I have the privilege to represent here the plaintiffs, people with developmental disabilities, their families, their organizations, and their providers. As Your Honor said before we adjourned, before you adjourned and we followed you, we are here, at least as to Title 19, because of the difference between two distinguished district court judges in this circuit. It is not the first time these very two distinguished judges have differed. Exeter Memorial Hospital, the Court had occasion to resolve a difference on the interpretation of this very statute, albeit a different section. I regret to say, because of the fondness that arose in my heart for the district court before whom we appeared, that plaintiffs believe that Judge Levy is correct and submit so to the Court. Now the factual patterns are slightly different in the two cases, but would you agree that the fundamental issue of a private right of action is common to both? Yes, sir. It's exactly the same issue and has, I think, Your Honor, been resolved both by Judge Levy's thorough and careful opinion and equally important by an authoritative line of decisions in the United States Supreme Court, which starts with Justice Harlan the Younger in Rosado and Chief Justice Warren in King in the early 1970s, and continues, reaches it to Patiosis in Pennhurst I, where Chief Justice, then Justice, Rehnquist, sounded the note of clarity and said, In those instances where Congress intends, forgive me, intended to find a certain entitlement as a condition of federal funds, it has proved capable of so doing. He then cites the companion statute to medical assistance and recites the words which appear here in this statute, that is, the state shall furnish assistance with reasonable promptness to all eligible individuals. That is the structure and focus of this statute, Your Honor, and through the present day, most notably in Sabree in the Third Circuit and Estee v. Hood in the Fifth Circuit, submitted recently under 29J to the Court, it is, from Rosado, an unbroken line of cases. Now, the beginning point and beginning- The question is where does Gonzaga fit in that unbroken line? I think squarely, Your Honor. Okay. The beginning and end point of analysis of statutory meaning is, of course, the text itself. I cannot improve upon the language analysis which Judge Alito exercised in the en banc decision of the Third Circuit in, forgive me, Pennsylvania Pharmacists Association. That's an important case because of the persuasive clarity of the analysis, Your Honors, but it is important also because it prefigures exactly the Supreme Court's reasoning in Gonzaga. Judge Alito focused upon canon and the similarity of the test for private cause of action to the test for enforceable rights under 1983. And he also emphasized the distinction between rights, which Gonzaga and the long line of cases alike held is what must be found in the statute, as against benefits or interests. Now, I will not rehearse for the Court the P through Q language analysis which Judge Alito exercises. Suffice it to say that he finds, as did the Fifth Circuit in Evergreen, that 30A, the precise provision at issue here, is drafted with an unmistakable focus on Medicaid beneficiaries. It is framed in terms of benefiting Medicaid beneficiaries. They are the persons Congress intended to benefit. It demands that payments be set at levels that are sufficient to meet beneficiaries' needs. It is worth noting, I think, that in this conclusion and analysis of Judge Alito, the entire en banc court joined. A graceful accomplishment and an emphatic one in any circuit. As Judge Becker wrote for the five dissenting, he joined in Judge Alito's analysis that this statute confers rights on recipients. What divided them was whether rights were provided for providers. That question is not necessary to the decision of this case. And as my colleagues in Clayworth will argue, and Judge Levy held, though you need not necessarily reach it, providers may well have standing as third-party beneficiaries to assert the rights of, not their own rights, but the rights of the recipients. The line of analysis there started with Judge Max Rosen's opinion in West Virginia University Hospitals against Casey, where he noted the close relationship, the virtually fiduciary relationship between providers such as those in these two cases and recipients. And it continues through Judge Sirica's opinion cited by Judge Levy and relied upon in Pennsylvania Psychiatric Association. A third circuit opinion. We should be especially grateful, then, we have Judge Cowen. Your Honor, I was full of joy when I read that. And, Your Honor, I look for you on the plane. Thank you. Now, this circuit would not be alone in joining Judge Levy's reasoning and holding. I have mentioned Sabree and Hood, both 2004 cases. The second circuit as well, in Rabin v. Wilson-Coker, held Section R6 enforceable. And while plaintiffs, while defendants wrongly characterize the right there as a right to a specific monetary payment, it was not, as the text of 1396 R6 shows. Rather, that is the statute that says after you are no longer eligible for public assistance, you may continue for six or 12 months to be eligible for all of the services that the medical assistance entitlement offers. Second, Ferguson, the long-term care opinion in the first circuit. Thank you. Judge Boudin. By Judge Boudin, which held most narrowly read that providers such as pharmacists do not have rights. There's an interesting last paragraph in which he said, nursing home providers might be a better representative of the recipient. Judge Boudin had joined the panel in Bryson and Shumway, another third circuit, forgive me, first circuit opinion post-Gonzaga, in which the court, Boudin joining, held that there were rights under N.C., 1396 N.C., the statute here, in recipients. He was not a member of the panel in Rowland and Salucci, another first circuit opinion, which found enforceable rights in recipients under a related provision of Title 19. Now, Judge Boudin, of course, is interpreting Gonzaga, and he says that regardless of whether it's a title shift or merely a shift in emphasis, we are obligated to respect it, controls this case, and holds contrary to your position. No, sir. I agree with the first part of your statement entirely. But Gonzaga does not hold contrary to your – No, no, no. Long-term care. It's quite right. Forgive me. We're all interpreting Gonzaga, but long-term care raised precisely the issue you're referring to, but held for Judge Wilkins' analysis. Yes. And, well, with respect to providers, Your Honor, you will notice that from one end of Judge Boudin's opinion to the other, there is nary a mention of recipients, unlike in the Fifth Circuit Evergreen and the Third Circuit Pennsylvania Pharmacy. That is, I suggest to the Court, significant because Judge Boudin had been a member of the panel which decided visiting Nurses Association v. Bullen. And in that case, the first circuit made two holdings. One, providers had rights under 30A. Two, recipients had rights under 30A. And you will notice, I believe, that from one end of the long-term care alliance decision to the other, the Court never calls into question the holding in Bullen with respect to recipients. And further, the Bryson and Shumway decision in which he joined is consistent with that, as is the third. Now, what do we do with Judge Boudin's language where he says, and I quote, if Gonzaga had existed prior to Bullen, the panel could not have come to the same result? Yes, Your Honor. But throughout, he is analyzing Bullen's reasoning and holdings with respect to providers. And I would suggest that that reference, like the rest of the opinion, is limited to the provider holding in Bullen. And Judge Boudin joining the Shumway and Bryson decision, that recipients, no provider question in that case, had standing, forgive me, had rights, I think tends to confirm that view. What's your view of what's underlying this attention to reading in private rights of action? Is it a lack of confidence in the ability of the federal government to administer these programs in terms of supervising the states? Is it a need for a separate enforcement mechanism? What's underlying all of this concern? Your Honor, I think what underlies it was most gracefully articulated by Justice Harlan, the younger, in Rosado, and it was in significant part exactly as Your Honor indicates. It was a life experience in the case of Justice Harlan that the federal government, the Congress understood, could not be expected to enforce this statute administratively. And as Harlan says, that is in significant part because the only remedy, apart from jawboning, available to the federal government is the cutoff of funds. And Justice Harlan both notes that in the programs that preceded the Rosado opinion, state plan programs like the one here, there had not been a single fund cutoff by the feds. And further he notes that a fund cutoff, in contrast to injunctive remedies under 1983, would, of course, injure the very persons whose rights the Congress had established and was eager to protect. If I may, Your Honor, to add to that. Before you leave that point, I'm just wondering what we should do with the language from Justice Breyer in Gonzaga, where among other things, and this was picked up by Judge Padin, that where he says much of the statute's key language is broad and nonspecific and suggests that exclusive agency enforcement might fit the scheme better than a plethora of private actions threatening disparate outcomes. Is there an evolution going on here? That was on all fours with respect to the Family Rights Privacy Act in front of the court in Gonzaga. But it is not on all fours here, as Judge Alito's linguistic analysis shows. And if I may, because Judge Wilkin relied very heavily for her decision on the Gonzaga court's invocation of the no-person-shall language of Title VI and Title IX, I think she overread that. Gonzaga offered that as language exemplary of rights creation. But as I've noted, Penhurst I noted the language in Title XIX as exemplary of clear grants of certain entitlements. And I think the Sabree and Esty v. Hood formulations, which, of course, succeeded, were subsequent to the decision of the court below in our case, indeed in both cases, I believe, disposes of that. Both courts wrote in the same language, the fifth quoting the third, I'm delighted to say, Judge Cowen, We find it difficult, if not impossible, as a linguistic matter to distinguish the import of the relevant Title XIX language, a state plan must provide, from the no-person-shall language of Title VI and IX. I think, Your Honor, that disposes the issue in the first half of our case. I am five minutes from closing time. And, Your Honor, for present purposes, reserving for rebuttal, I will rely upon our briefs. And, of course, farewell. Very well for the 5048. Very well, Mr. Gohold. Thank you. Thank you. We'll now hear from Ms. Carson. Good morning. My name is Susan Carson, and I'm from the office, the California Office of the Attorney General, representing the state defendants in this matter. Sorry. Justice O'Scanlan, I'd like to address the question that you posed to us before we took the break. You said we have opinions from two very respected district court judges, and they differ. They are the same in one respect. Both courts found that providers do not have a private right of action. And, in fact, that has been the universal determination by all the courts since Gonzaga that have considered whether or not providers have a private right of action under 1396AA30A. The district courts did differ as to whether recipients have a private right of action. I'd like to make one point first, that when I briefed this issue in the fall of 2001 to Judge Wilkin, with regard to the efficiency, economy, and quality of care provision under the blessing test, she ruled against us. She found that, in fact, the statute was intended to benefit, which is the first prong of the blessing test, both providers and recipients, and dismissed our motion for partial summary judgment. After Gonzaga came down, we filed a motion for reconsideration and did the analysis under the test under Gonzaga, which says that the statute must exhibit unambiguous rights-creating language. And I believe that the district court in Sanchez got it exactly right. There is no rights-creating language in this particular provision for recipients. When they say unambiguous language, do they mean it has to expressly say in so many words that there's a private cause of action, or can't the statute be read, such as Pennsylvania pharmacists, that it's the only logical conclusion? Well, first, Your Honor, I'd point out that Pennsylvania pharmacists was decided pre-Gonzaga. So the issue that the court was looking at there are whether Medicaid recipients, well, first of all, it was a case that only involved providers. So the language as to beneficiaries is dicta, number one. And they were only looking at the statute as to whether or not providers have a private right of action and whether they were intended beneficiaries. And I would argue to this Court that, in fact, providers probably have a closer right than recipients do, because the statute says, a state plan for medical assistance must provide for methods and procedures relating to the utilization of and the payment for care and services available under the plan, as may be necessary to safeguard against unnecessary utilization and to assure that payments are consistent with efficiency, economy, and quality of care, and are sufficient to enlist enough providers, and so on. So, in fact, I'm not sure that the Third Circuit would make the same decision post-Gonzaga. Counsel, I'd be interested in your specific response to Mr. Gahl's argument that no person shall is no different than the state shall provide. I think they're entirely different, actually. I mean, under the Title VI and Title IX, there is absolutely no question that the benefit of that provision are individuals. No person may discriminate against people on the basis of race or on the basis of gender. There's absolutely no question. Whether or not, first of all, I should point out that A30A is one of 65 different requirements for a state plan. And I believe that the Subree Court got it right when it said, if you look at the authorizing provision of 1396 and the substantial compliance provision of 1936, this does not help recipients. There is no focus on recipients there. That is just the authority for the federal government to give states money and the contract, if you will, between the states and the federal government what the state must do. And the 65 requirements for the state plan are the deal, if you will, for the state. And the state must comply with those provisions and have them in their state plan in order to receive federal funds to provide medical services to the disabled and the poor. What about some of these other cases, though, that have reached a different interpretation? Hood, Subree, and for that matter, Judge Levy. Well, I'll take, discuss Subree and Hood. First of all, none of those cases do not deal with A30A. And I think that we need to, it's very clear, it's even clear in the Pennhurst decision that you have to look at the statute that's issued, and you can't pull out certain words and certain phrases from the statute. You must look at the text and structure, as Gonzaga instructs, and to determine whether or not there is an unambiguous, it's unambiguous that Congress intended that this provision be privately enforceable. So, first of all, those cases don't deal with A30A. As to Judge Levy, I think where he and Judge Wilken part company, really, or where he, his error mainly is in relying on 42 U.S.C. 1320A2, which was a statute passed by Congress after the Supreme Court's decision in Souter, which basically, it's a little unclear, but it appears to mean, and has been interpreted by the 11th Circuit and another older, you cannot rely solely on the fact that a provision is in a state plan to say it's not enforceable. And I believe that Judge Levy overread 1320A and basically said that excuses the plaintiffs from showing that there's right-screening language here. I would also add that under SBREE, A8 says that a state plan must provide, I can't remember the exact wording, but something about medical assistance with reasonable promptness to individuals with reasonable promptness. And 10A says medical assistance must be provided to all eligible individuals. So while I don't completely agree with the SBREE decision, I would say it gets you much closer to saying that that provision is in the statute for the benefit of recipients. Whereas here, it's an instruction to the state about what it should consider when it's coming up with payment rates. Now, Justice O'Scanlan, I believe that you quoted some language from long-term care pharmacy, and we quoted that language and then further part of the opinion where the First Circuit said, and I believe, we believe this language applies to recipients as well as providers. Subsection 30A presents the same concern, and this is referring back to Judge Breyer's concern about different outcomes in different states. I'm sorry, this is at page 53 of our brief. Subsection 30A presents the same concern, that criteria, avoiding overuse, efficiency, quality of care, geographic quality, are highly general and potentially in tension. And read literally, the statute does not make these directly applicable to individual state decisions. Rather, state plans are to provide, quote, methods and procedures to achieve these general ends. And we believe that that language applies to recipients as well as providers. We believe that Judge Wilkin got it correct when she said the statute has an aggregate focus. There's no indication in the statute that it's solely to benefit recipients, actually. I mean, I think there's language in there that would protect the public fisc for taxpayers and certainly providers who are interested in the payment rate they receive. And, of course, the statute is subject to the substantial compliance provision, which would indicate that a state is not required to provide every single person a certain level of quality or access, but rather that those are the considerations that a state should consider when it's creating its payment rates. I'm looking at Judge Wilkin's second opinion, the one that's dated January 5th, and she makes a recital on page 8. There is no post-Gonzaga case in which a court considering the guidelines articulated in Gonzaga has found that a Section 30A has found that Section 30A gives Medicaid recipients a private right enforceable under 1983. Is that still good in terms of where this is, what, 10 months later? Right. No, it is not, Your Honor. There have been a couple of district courts where they have found that beneficiaries have a private right of action. Southern Missouri. That's correct, and that's the Beatus v. Ball case, I believe. And that is just a statement of findings of fact, and there's no discussion. It's just a statement saying we find that they have a private right of action. Is there any other? Yes. I'm trying to think. I think there's a Northern District of Illinois case, Memesovsky, which found that recipients have a private right of action. In that case, they pull out, as I believe do the plaintiffs, sort of pull out the language quality of care and access as stand-alone requirements, and ignoring the text and structure of the statute, which is clearly focused on the state having methods and procedures for creating its payment rates. Drawing a blank. Let's see. Yes. Sorry. The U.S. District Court in Utah, MAC, the MAC decision, found that they did not have a private right of action, and that's a very well-reasoned opinion. So there is actually a bit of a split. So there are three hosts. There are others. I believe the District Court mentioned a couple of them. She relied some. Mr. Gilhool will help us with some cases on that side. But I just want to give you a chance to tell us whether we should be looking at post-January 5th developments in the light of this recital made by Judge Wilcott. Right. And I'm just trying to remember, because I've actually been following all the cases that are dealing with 1396A, and many of them do not deal with A30A. But I would ‑‑ But in terms of the A30As, there are two going against you, and is there one going with you? Is that what you're saying? Yes, the MAC decision, I believe. Is that the A30A? Yeah. All right. The MAC decision. I believe it's cited in our brief. All right. Great. And I believe that the cases, Your Honor, are outlined in our brief up to this point, and then I believe Minasovsky was decided in August, and I believe that's the only case on ‑‑ and Betus v. Ball, but there's no discussion there of the issue, are the only cases as to A30A. But I would also point out, for all the courts, I think it's safe to say that for all the courts that did find there was a private right of action, they either did not do the analysis under Gonzaga, or, as Judge Levy did, they pull out access and quality of care as separate stand‑alone requirements, ignoring the rest of the statute and ignoring the focus of the statute. In fact, I disagree with Judge Wilkin in terms of pulling out quality, which is what she did on summary judgment. She said we had shown enough that we were meeting the efficiency economy provisions of efficiency economy and quality of care, but, in fact, I believe that statute should be read together, consistent with efficiency economy and quality of care, and that that is an instruction to the state, essentially, to create rates that are efficient and economic, but high enough to come up with quality or the reverse, not so high as to not be efficient or economic. So if you do the analysis, reading the statute, looking at the text and structure of the statute, it's very clear that there is no rights‑creating language, the recipients are not the special beneficiaries under this provision. In fact, there are many potential beneficiaries under the statute, and that there are no stand‑alone requirements. As you might say, there would be under A8 or A10. I'd like to just take the last few minutes with regard to plaintiff's appeal of their claim under the ADA. Judge Wilkin wrote a painstakingly detailed 57‑page decision, most of which dealt with ‑‑ she went through the facts and went through most of it is actually having to do with the ADA claim. The plaintiffs did not meet their burden as to a single element of the cause of action. They did not show that anyone was unjustified, did not establish that anyone was unjustifiably institutionalized. Are there two people that are institutionalized now that are not in community care? In fact, Your Honor, no, only one. Mr. Sanchez is now living in the community and has been, I believe, for almost a year. Mr. Nguyen has been offered several placements and has chosen not to take any of those placements. But the state and the regional centers are continuing to work on placing him. He presents special challenges because he's so medically involved. Originally there were 12 or 14 or? I believe there were seven or eight, I'm sorry. Seven or eight, I think. Yeah, seven or eight. And there's only one left in institutional care. That's correct. With respect to Mr. Sanchez, does that moot his cause of action here? I don't believe that mootness is an issue here because I think that's in response to our claim. In other words, if he is no longer institutionalized, hasn't he? For his individual claim, I would argue yes, Your Honor. It does not necessarily moot the class. But as Judge Wilkin found, none of the named plaintiffs were unjustifiably institutionalized, and therefore the plaintiffs would not be entitled to injunctive relief. So she made that determination even when Mr. Sanchez was still living in a developmental center. So they did not show that anyone was unjustifiably institutionalized. But more glaring, they failed to show that anyone was institutionalized because wages were paid to community care workers, that those wages were too low. In fact, the evidence showed that the payments are made to providers, providers decide what wages to be paid, and they were not able to show that even one person was institutionalized because payment rates were too low, let alone whether the wages were sufficient or not. They also failed to establish that the modification that they sought for the alleged violation was reasonable. They posited to the court that it would cost $1.4 billion to double the wages of the current workers in the community. And I believe Judge Wilkin correctly found that there was no evidence in the record that the doubling of wages would get one single person out of an institution. In fact, she found that it would probably have the opposite effect because there would be less money available to get the care and services that individuals need to move into the community. I have no further questions. No questions. Thank you, counsel. Thank you very much. Mr. Gil, will you have some reserved time? Yes, Your Honor. As my friend Susan Carson says, Judge Wilkin did indeed rule in favor of plaintiffs on the 19 issue here, but not just once, twice. She also denied a defendant's motion for interlocutory certification to this court, holding it so very clear. I submit that Judge Wilkin was right the first two times. Now, with regard to Pennsylvania Pharmacy, it is correct that in time that decision is pre-Gonzaga, but it applies, I submit, Your Honor, Gonzaga's elements, analysis, and emphases. Indeed, it prefigures Gonzaga. And, Your Honor, I am not aware of any other district court opinions or circuit opinions on 30A. I assure you, if any appear, we will present them to you. The Memosovsky case, which we sent on early to the clerk of the court, is among the district court opinions the most carefully reasoned. And the Northern District of Illinois judge there expressly and analytically differs with Judge Wilkin and agrees with Judge Levy. The decision by Judge Carroll in Ball is a series of findings and conclusions, but nonetheless, Your Honor, it is tersely persuasive, a test I fail, I'm afraid, and highly germane here because it is exactly the same cause of action in Arizona as that presented in Sanchez, and that is the violation of 19, as well as ADA 504, from wages and rates so low, that turnover is so high that the quality of programs, because continuity is required for quality of programs for people with developmental disability, is destroyed. Now, are there any other cases that come to mind? You recall that passage I read. Yes, Your Honor. Other cases on 19? Other cases since Judge Wilkin's order of January 5th that have gone one way or the other. We heard from Ms. Carson. I just wondered what other cases you would add, again, on both sides. No, Your Honor. There are no others other than Memosovsky and Ball and the Utah opinion, which is what it is. Judge Wilkin, however, did not look to Pennsylvania Pharmacy or Evergreen, both of which were pre-decided, nor did she have the benefit, unfortunately, because it was on the eve of the eve of Christmas, Judge Levy's decision, and her opinion was filed on the Monday after New Year's. But in any event, Your Honor, if I may ever so briefly address the second and very important issue in this case, as Ball and Bledsoe, Judge Carroll's opinion indicates. First, I want to call to the Court's attention that the Ninth Circuit decision in Townsend is the first of a trilogy of circuit court opinions, each of the other two expressly following Townsend. Fisher in the Tenth Circuit and Frederick Gale in the Third Circuit, which address reasonable modifications and most particularly the proof required to establish an Olmstead plan defense and to establish any other dimension of a fundamental alteration. Each of those cases, as their citations acknowledge, in fact, is rooted in Hellenel, the decision of the Third Circuit where you, Judge Cowen, were a member of the panel, which decision, again, I suggest analytically a view of the opinions will show you, prefigured the Supreme Court in Olmstead. On the burden of proof question, Olmstead plainly requires defendant states to demonstrate that they have a comprehensive plan. Here, the judge does not find nor is there any record evidence that there was a waiting list, one of the required elements in Olmstead. Indeed, defendants avow in the record before the Court that they had no waiting list, no placement list. The Williams and Wasserman case, which defendants cite, came to a different conclusion precisely because Maryland had a waiting list. Defendants here have eschewed any such public communicated, ordered, toted up analysis of what people are entitled to the integration mandate and in what order and over what time will it be supplied. All defendants have in the record is a two-year plan touching only 183. Thank you, Counsel. Your time has expired. I thank you, Your Honor. The case just heard will be submitted for decision. And we will now move to
judges: O'scannlain, Cowen, Bea